**Revised May 3, 2000**

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

—————————

No. 98-50264

—————————

RICHARD CONNER; CHRIS CONNER;

Plaintiffs - Appellants,

versus

TRAVIS COUNTY; ET AL,

Defendants

TRAVIS COUNTY; TERRY KEEL, Sheriff; FRED McAFEE, Travis County Sheriff's Deputy;

Defendants - Appellees

—————————

No. 98-50895

—————————

RICHARD CONNER; CHRIS CONNER;

Plaintiffs - Appellees

versus

TRAVIS COUNTY,

Defendant - Appellant.

Appeals from the United States District Court
for the Western District of Texas

Before REYNALDO G. GARZA, JONES, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:

Richard and Christine Conner appeal the district court's grant of judgment as a matter of law in favor of Travis County ("the County") and Travis County Sheriff Terry Keel. The County Attorney's Office ("CA's Office"), which represented the County and Keel, cross-appeals the court's imposition of sanctions against it. We affirm in part and reverse in part.

**I**

Richard Conner was arrested on an outstanding warrant for a bad check when he attempted to renew his driver's license at the Department of Public Safety ("DPS"). He was held by a DPS deputy until officials from the County Sheriff's Department arrived and brought him to the County's Central Booking Facility ("CBF"). There, Deputy Sheriff Fred McAfee, who completed intake on Mr. Conner, filled out a medical sheet on Mr. Conner. Mr. Conner told McAfee he had suffered a stroke one month before and that he needed to take medication for his stroke; Mr. Conner was supposed to take the medication every morning and had not yet taken that morning's dose. McAfee flagged Mr. Conner's file and placed it in the nurse's box for him to receive attention.

Mr. Conner alleges that he asked McAfee and several others at CBF to be allowed to take his medication, telling them about his condition and that it was worsening. Instead of giving him his medication, they allegedly called him a drunk and told him to stop faking his symptoms. Mr. Conner, who was allowed to make telephone calls throughout this time, eventually telephoned his doctor, who ascertained that Mr. Conner's condition was worsening and arranged to have an ambulance take him to the hospital for emergency treatment. Although he ultimately received treatment, he alleges that

-2-

the delay in obtaining it caused him permanent damage.

The Conners subsequently filed this lawsuit, proceeding to trial against the County, Keel, and McAfee. On the day before the trial finished, the court granted Travis County's and Keel's motions for judgment as a matter of law on the Conners' claims against them for failure to train under 42 U.S.C. § 1983.

The jury ruled in favor of McAfee. The Conners moved for a new trial and both sides moved for attorney fees. The district court denied all the motions except for the Conners' motion for attorney fees: the court imposed sanctions of $5,575 against the CA's Office to cover the Conners' appellate attorney fees for an earlier interlocutory appeal the CA's Office had filed. The Conners now appeal the court's ruling on the motions for judgment as a matter of law. The CA's Office cross-appeals the imposition of sanctions.

## II

Federal Rule of Civil Procedure 50(a) allows a court to grant judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). We review a grant of judgment as a matter of law *de novo*, applying the same standard the court below applied. *See McCoy v. Hernandez*, 203 F.3d 371, 374 (5th Cir. 2000). We will affirm if "the facts and inferences point so strongly and overwhelmingly in favor of the moving party [that] no reasonable jurors could have arrived at a contrary verdict." *Id.*

Counties and supervisors are not liable for constitutional violations committed by county employees unless those violations result directly from a municipal custom or policy. *See City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203, 103 L. Ed. 2d 412, __ (1989); *Breaux*

*v. City of Garland*, 205 F.3d 150, 161 (5th Cir. 2000).  The Conners premise their claim on a failure by the County and Keel to train CBF staff to handle a medical condition like Mr. Conner's.  To succeed on their failure to train claim, the Conners must show three things:  "(1) the training or hiring procedures of the municipality's policymaker were inadequate, (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy, and (3) the inadequate hiring or training policy directly caused t he plaintiff's injury."  *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996).  The second showing, deliberate indifference, is at issue here.

Deliberate indifference is more than mere negligence.  *See Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992) ("While the municipal policy-maker's failure to adopt a precaution can be the basis for § 1983 liability, such omission must amount to an intentional choice, not merely an unintentionally negligent oversight."); *see also Doe v. Taylor Independent Sch. Dist.*, 15 F.3d 443, 453 n.7 (5th Cir. 1994) (distinguishing "deliberate indifference" from "gross negligence" by noting that "the former is a 'heightened degree of negligence,' [whereas] the latter is a 'lesser form of intent'") (quoting *Germany v. Vance*, 868 F.2d 9, 18 n. 10 (1st Cir.1989)).  The Conners must show that, "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *City of Canton*, 489 U.S. at 390, 109 S. Ct. at 1205, 103 L. Ed. 2d at __, *quoted in Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992).

The Conners concede that County policy required qualified medical staff to be available to treat detainees presenting both emergency and non-emergency conditions.  They also concede that County policy required staff to obtain immediate medical treatment for detainees presenting

emergency conditions and less immediate treatment for non-emergency conditions. Additionally, they concede that CBF staff had training in first aid and CPR. Finally, they do not dispute several facts: Mr. Conner did not present emergency symptoms on arrival or indicate that he was experiencing an emergency; he was still speaking and walking around when he began to complain of symptoms; and he was in the CBF without immediate medical treatment for at most an hour. The Conners premise their failure to train claim on the fact that the County did not train CBF officials to recognize emergency conditions as they developed or to understand the significance of the symptoms and condition which Mr. Conner presented. Their argument is essentially that jail officials should have been trained to recognize that—in spite of Mr. Conner's apparent non-emergency condition—Mr. Conner required immediate medical attention because of his stroke history, his need for medication, and his subsequent symptoms.

The Conners did not attempt to prove that the County's failure to train its staff in distinguishing between emergency and non-emergency conditions was deliberately indifferent by showing that prior incidents gave the County or Keel notice of the need for specific training. Instead, they rely on the single episode with Mr. Conner and on their expert's statements about the need for more training. We have previously noted the difficulty plaintiffs face in attempting to show deliberate indifference on the basis of a single incident. *See Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000) ("We have consistently rejected application of the single incident exception and have noted that 'proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training.'") (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998)). This difficulty is necessarily heightened for the Conners because of the type of case they bring. We can reasonably expect—if the need for training in this area was "so obvious" and the failure to train was

"so likely to result in the violation of constitutional rights"—that the Connors would be able to identify other instances of harm arising from the failure to train. The fact that they did not do so undercuts their deliberate indifference claim.

Additionally, the Conners did not provide any general evidence about stroke conditions. For example, they did not show stroke incident rates in the general or detainee population from which a jury could infer a need for specific training. Nor did they provide detailed evidence about the consequences (aside from the alleged consequences in this case) of not providing immediate treatment when a person exhibits stroke symptoms or misses their daily medication for four or five hours. Finally, their evidence regarding professional and regulatory standards in jails at best only tenuously supports an argument that the County's training fell below these standards.[1]

Instead, the Conners' showing of a need to train was premised on the testimony of their expert witness, who claimed, without citing underlying data, that detainees with stroke symptoms would present themselves so frequently that County staff should be trained to recognize them. By itself this is unpersuasive. We have previously noted that plaintiffs generally cannot show deliberate indifference through the opinion of only a single expert, *see Snyder*, 142 F.3d at 799 ("Furthermore, we have emphasized that, when seeking to prove a municipality's malevolent motive, plaintiffs must

---

[1] Although the Conners' expert suggested that the County's training did not comply with the Texas Jail Standards, he did not testify that the Standards specify what training must be given on recognizing emergency conditions. He only stated that: "the standards specify that inmates will receive . . . emergency medical care, that they will be screened medically when they are first brought into the jail, and that the screening will be accompanied by a medical person or by a trained officer, and that if there are any emergencies in the process, that they will be referred immediately to the medical department for review." On cross-examination, he stated that, based on his reading of the Texas Jail Standards, "I would assume that if they are going to do medical screening, then they are either going to be medical personnel or trained officers."

On cross-examination, the expert was also unable to identify any portion of the American Corrections Association Standards or the National Commission on Correctional Health Care Standards which "set[s] out the degree of medical training officers must have in order to do intake screening."

introduce more evidence than merely the opinion of an expert witness."); *Stokes v. Bullins*, 844 F.2d 269, 275 (5th Cir. 1988) ("[A]n expert's opinion should not be alone sufficient to establish constitutional 'fault' by a municipality in a case of alleged omissions, where no facts support the inference that the town's motives were contrary to constitutional standards."), and this witness's testimony was little more than his opinion.

Aside from their expert, the Conners presented no evidence that the County or Keel should have known of a risk of harm arising from slowly-diagnosed stroke symptoms, let alone that this risk showed deliberate indifference because it was "so obvious" that the failure to offer specific stroke training was "so likely to result in the violation of constitutional rights." *City of Canton*, 489 U.S. at 390, 109 S. Ct. at 1205, 103 L. Ed. 2d at __. Thus, they failed to show deliberate indifference and judgment as a matter of law against them was appropriate.[2] In this regard this case is similar to *Benavides*, where jail guards took no action when a detainee hit his head in jail and lay on the floor paralyzed for eighteen hours requesting hospitalization; the jail guards allegedly thought the detainee was faking his condition. *See Benavides*, 955 F.2d at 970-71. The detainee and his wife sued, arguing, *inter alia*, that the County and Sheriff were deliberately indifferent for not giving more medical training to the jail guards. *See id.* at 970. The district court granted summary judgment to the defendants and we affirmed, noting, as here, that the guards were trained in "the basic medical training required by Texas law" and that the plaintiffs submitted no evidence of inadequacy other than their allegations and the testimony of an expert which was properly disregarded. *See id.* In the case

---

[2]    The Conners argue that the district court's grant of judgment as a matter of law to the County and Keel is inconsistent with its earlier denial (affirmed by us on appeal) of their motion for summary judgment. This position lacks merit. Although we have observed that the standards for determining whether summary judgment should be granted are the same as those for determining when judgment as a matter of law is appropriate, *see Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 n.4 (5th Cir. 1996), the summary judgment motion addressed immunity issues. Additionally, the motion was based on different evidence than ultimately was presented at trial.

-7-

before us, of course, the district court did not exclude the expert's testimony, but, as noted above, the testimony of a single expert is generally inadequate to show deliberate indifference. *See Snyder*, 142 F.3d at 799 (finding no deliberate indifference, in spite of an expert's testimony to the contrary, when "[t]here was no evidence of a pattern or practice of constitutional violations committed by overstressed New Orleans officers" and "[t]here was no evidence showing that the city was aware of the supposedly high stress levels in the NOPD or knew that the absence of a stress management program was likely to endanger the constitutional rights of its citizens."); *Stokes*, 844 F.2d at 275.

**III**

The CA's Office cross-appeals the imposition of sanctions against it. Before trial, the CA's Office moved for summary judgment on various immunity grounds. The court denied the motion and the CA's Office filed an interlocutory appeal, which caused the district court to stay the trial and which apparently left the court with a vacancy in its trial calender. Before staying the trial, the court warned the CA's Office that the appeal lacked merit. After the trial, the court sanctioned the CA's Office for the appeal by awarding the Conners $5,575 for their appellate attorney fees. Although the court noted the important policy reasons allowing government employees to bring immediate appeals on immunity issues, *see, e.g.*, *Behrens v. Pelletier*, 516 U.S. 299, 305-08, 116 S. Ct. 834, 838-39, 133 L. Ed. 2d 773, __ (1996) (noting the policy rationale for allowing direct appeals of qualified immunity issues, and finding that no rule prohibited a defendant from appealing the denial of qualified immunity twice in a single case, at both the motion to dismiss stage and the summary judgment stage), it found that "the County's practice of promiscuously asserting unmeritorious qualified-immunity arguments in dilatory interlocutory appeals is a wrong to be punished."

The court imposed sanctions under 28 U.S.C. § 1927 and under its inherent powers. *See* 28

U.S.C. § 1927 (allowing sanctions against "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously"); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 35-51, 111 S. Ct. 2123, 2128-36, 115 L. Ed. 2d 27, __ (1991) (recognizing that a district court has inherent powers to sanction a party by awarding the other side attorney fees and related expenses). A court can sanction under § 1927 when there is "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court." *Edwards v. General Motors Corp.*, 153 F.3d 242, 246 (5th Cir. 1998). A court may use its inherent powers to sanction an attorney who acts in bad faith. *See Kipps v. Caillier*, 197 F.3d 765, 770 (5th Cir. 1999). Invocation of either sanctioning power is the exception rather than rule, *see Kipps*, 197 F.3d at 770 ("[T]he threshold for the imposition of such sanctions is high."); *Edwards*, 153 F.3d at 246 ("Because of the punitive nature of § 1927 sanctions, and in order not to chill legitimate advocacy, the provision must be strictly construed."), although we review the exercise of either for an abuse of discretion, *see Walker v. City of Bogalusa*, 168 F.3d 237, 240 (5th Cir. 1999); *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995). "A district court abuses its discretion if it awards sanctions based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Walker*, 168 F.3d at 240 (quotations omitted).

We first consider whether the district court erred by awarding sanctions because it found that the interlocutory appeal was meritless. In *Chambers*, the Supreme Court rejected a *per se* rule barring a court from sanctioning parties for conduct they take outside its courtroom: "[a]s long as a party receives an appropriate hearing . . . the party may be sanctioned for abuses of process occurring beyond the courtroom, such as disobeying the court's orders." *Chambers*, 501 U.S. at 57, 111 S. Ct. at 2139, 115 L. Ed. 2d at __. Applying that rule to the case before it, the Court found that the district court properly sanctioned a party "who attempt[ed] to gain the FCC's permission to build

-9-

a new transmission tower . . . in direct contravention of the District Court's orders to maintain the status quo pending the outcome of the litigation."[3]  *Id.*

We limited *Chambers's* reach in *Matter of Case*, 937 F.2d 1014 (5th Cir. 1991), where we held that a bankruptcy court erred in sanctioning a party for bad-faith conduct which occurred in a separate state court proceeding.  *Id.* at 1023.  We distinguished *Chambers* by stating:

> The state court proceeding in the instant case is completely collateral to the proceedings in bankruptcy court.  The conduct of the parties in the state action cannot be said to affect the exercise of the judicial authority of the bankruptcy court or limit the bankruptcy court's power to control the behavior of parties and attorneys in the litigation before it.  Inherent power must arise from the litigation before that court.  Although the substantive issue in the state court proceeding is the same, the conduct of the parties in that suit is unconnected to the present action.

*Id.* at 1023-24.

*Case* does not directly preclude the district court's sanction award here, as the sanctions directly arose from litigation before the court.  Nevertheless, the sanctions do not fit within the example of permissible sanctions which *Chambers* provided:  actions taken in another forum "in direct contravention of the District Court's orders."  *Chambers*, 501 U.S. at 57, 111 S. Ct. at 2139, 115 L. Ed. 2d at __; *see also CJC Holdings, Inc. v. Wright & Lato, Inc.*, 989 F.2d 791, 793 (5th Cir. 1993) (distinguishing *Case* from *Chambers* and noting that the filing in *Chambers* "not only directly violated the district court's order to maintain the status quo pending the outcome of the litigation but also, if successful, would have eviscerated the court's ability to enforce specific performance if it so ordered").

---

[3]    The County Attorney's Office attempts to distinguish *Chambers* by noting that in *Chambers* the appellate court first determined that the appeal was frivolous and sanctionable.  *See Chambers*, 501 U.S. at 40, 111 S. Ct. at 2130, 115 L. Ed. 2d at __.  This distinction was not relevant to the Court's conclusion that a "party may be sanctioned for abuses of process occurring beyond the courtroom."  *Id.* at 57, 111 S. Ct. at 2139, 115 L. Ed. 2d at __.

Our sister circuits disagree as to whether a district court can sanction a party for filing an interlocutory appeal which lacks merit. The Ninth Circuit reads *Chambers* more broadly than we do. *Compare Western Sys., Inc. v. Ulloa*, 958 F.2d 864, 873 (9th Cir. 1992) (citing *Chambers* and allowing a court to sanction litigants for proceedings in a Guam court) *with Matter of Case*, 937 F.2d at 1023-24 (striking down a bankruptcy's courts sanctions against a party for acts in state court). By contrast, other circuits have held—even post-*Chambers*—that district courts cannot generally sanction parties for appeals. *See In re Villa West Associates*, 146 F.3d 798, 808 (10th Cir. 1998) ("[T]he determination of the right to sanctions . . . for conduct during an appeal is reserved to the appellate court, although it may allow the trial court to fix the amount of the fees and costs.") (quoting *Morris by Rector v. Peterson*, 871 F.2d 948, 951 (10th Cir.1989)) (alteration in original); *Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926, 935 (2d Cir. 1992) ("In any event, it is improper for a district court to impose sanctions for appeals taken to this Court."). We are persuaded by precedent and the policies underlying a court's ability to sanction that the latter approach is the better one.

The purpose of a court's sanctioning power is to enable it to ensure its own proper functioning. *See Chambers*, 501 U.S. at 43, 111 S. Ct. at 2132, 115 L. Ed. 2d at __ ("It has long been understood that [c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.") (quotations omitted and alteration in original); *United States v. International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) ("The purpose of [§ 1927] is 'to deter unnecessary delays in litigation.'") (quoting H.R. CONF. REP. NO. 1234, 96TH CONG., 2D SESS. 8, *reprinted in*

1980 U.S.C.C.A.N. 2716, 2782). Although the court below felt that its ability to manage its docket was impinged by the CA's Office's appeal, it possessed means other than sanctions of efficiently managing its docket.[4] Given these other means, the court's interest in using sanctions to ensure its proper functioning was clearly outweighed by the reasons arguing against imposing sanctions for an interlocutory appeal.

Most notably, of course, the appellate court is generally better qualified to determine whether an appeal lacks merit. This finds expression in the Federal Rule of Appellate Procedure allowing only "a court of appeals" to impose "just damages and single or double costs to the appellee" in a frivolous appeal. Fed. R. App. P. 38; *cf. Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 406-07, 110 S. Ct. 2447, 2461-62, 110 L. Ed. 2d 359, __ (1990) (citing Fed. R. App. P. 38 and the sanctions it allows in support of the Court's reading that Fed. R. Civ. P. 11 only allows sanctions for "expenses . . . at the trial level" and not for the costs of defending an appeal).

Additionally, there is the strong policy the district court itself noted of allowing interlocutory appeals of qualified immunity rulings. *See Behrens*, 516 U.S. at 305-08, 116 S. Ct. at 838-39, 133 L. Ed. 2d at __. The Supreme Court has previously noted how this policy outweighs the need to prevent dilatory tactics by defendants, particularly given other options that remain open for preventing delay. *See id.* at 310-11, 116 S. Ct. at 840-41, 133 L. Ed. 2d at __.

Finally, allowing parties to obtain sanctions from the district court for a frivolous interlocutory appeal would allow a party to raise the sanctions issue before the district court when, as here, it did not raise that issue before the appellate court. This might in turn discourage otherwise meritorious appeals. *Cf. Cooter & Gell*, 496 U.S. at 408, 110 S. Ct. at 2462, 110 L. Ed. 2d at __ ("Limiting Rule

---

[4] Most notably, of course, the court could have set an earlier motion cutoff date.

-12-

11's scope [to expenses incurred at trial but excluding appellate expenses] accords with the policy of not discouraging meritorious appeals."). Given that we can sanction an appellant for a frivolous appeal *sua sponte*, *see* Fed. R. App. P. 38 (allowing us to enter sanctions after notice), no benefit accrues from allowing district courts to apply sanctions separately solely because of a frivolous appeal.[5]

Having determined that sanctions on the basis of a frivolous appeal are improper, we must consider whether the district court had any other reason for imposing sanctions. The court identified two additional reasons. First, the court noted the CA's Office's history of filing meritless appeals. However, just as it was improper for the court to determine the merits of the instant appeal, so was it inappropriate for the court to consider the merits of other appeals absent an imposition of sanctions by us in those appeals.

Second, the court found that the CA's Office unduly delayed filing its appeal. Although dilatory conduct evincing bad faith might justify sanctions, we do not find support for the district court's finding of undue delay in the record. The CA's Office filed its motion for summary judgment before the motion cut-off date, and it filed its interlocutory appeal within two days of the district's court ruling. Although the CA's Office could have filed its motion earlier, the fact that it filed the motion within the time allowed by the court and then promptly appealed does not support a finding that it unduly delayed.[6] Additionally, even if the CA's Office had unduly delayed in filing the appeal,

---

[5] We only hold that a district court may not sanction based on its determination that an appeal is frivolous. A district court can still calculate sanctions if we determine that an appeal is frivolous and remand to the district court to award justifiable damages, costs, or fees. *See, e.g.*, *Olympia Co., Inc. v. Celotex Corp.*, 771 F.2d 888, 894 (5th Cir. 1985) (granting the appellee's request for appellate expenses in light of the frivolity of the appeal, but remanding for the district court to determine the amount incurred on the appeal).

[6] The court also suggested the CA's Office's has previously used appeals as a delay tactic by filing "similarly meritless interlocutory appeals just prior to trial." Even if it was proper for the court to look to conduct

the appropriate remedy would be to sanction it according to what occurred before the district court, not by awarding the appellee's appellate attorney fees.

In sum, the district court relied on an erroneous view of the law in sanctioning the CA's Office for a meritless appeal, and it lacked evidence to find that the CA's Office unduly delayed. Accordingly, we find that it abused its discretion in imposing sanctions.[7] *Cf. Walker*, 168 F.3d at 240.

## IV

We AFFIRM the district court's grant of judgment as a matter of law to the County and Keel. We REVERSE the court's award of sanctions to the Conners.

---

which did not occur before it as a means of evaluating the conduct which did occur before it, *cf. Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.*, 38 F.3d 1414, 1418 (5th Cir. 1994) (affirming sanctions where the district court mentioned collateral bankruptcy proceedings in its sanctions order; the district court did not sanction the party for those proceedings, but rather, "[t]he references to those proceedings contributed to the district court's implicit determination that the 60(b)(6) motion [before it] was in bad faith, or undertaken with an improper motive"), the court still had insufficient evidence of delay in the case before it to justify sanctions.

[7] Because we reverse the sanctions award on this grounds, we do not reach the CA's Office's alternative arguments that we should reverse because it was given insufficient notice about sanctions or because § 1927 applies only to individual attorneys and not to offices.

-14-